**AMERICAN BANK OF TULSA,**
Plaintiff-Appellant,

John L. Arrington, Jr., et al., Applicants for Intervention-Appellants,

v.

James E. SMITH, Comptroller of the Currency, Defendant-Appellee,
and

Floyd A. Calvert, Jr., et al., Intervenors-Defendants-Appellees.

Nos. 74-1082, 74-1083.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 10, 1974.

Decided Oct. 4, 1974.

Jack R. Givens of Jones, Givens, Brett, Gotcher, Doyle & Atkins, Inc., Tulsa, Okl. (Thomas R. Brett, Tulsa, Okl., on the brief), for plaintiff-appellant.

John L. Arrington, Jr. of Huffman, Arrington, Scheurich & Kihle, Tulsa, Okl. (John A. Gaberino, Jr. and J. Clarke Kendall II, Tulsa, Okl., on the brief), for intervention-appellants.

Judith H. Norris, Atty., Dept. of Justice (Carla A. Hills, Asst. Atty. Gen., Nathan G. Graham, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, on the brief), for defendant-appellee.

William C. Anderson of Doerner, Stuart, Saunders, Daniel & Langenkamp, Tulsa, Okl. (Dickson M. Saunders, Tulsa, Okl., on the brief), for intervenors-defendants-appellees.

Before BREITENSTEIN, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The question here presented is whether the trial court erred in granting the motion for summary judgment of the above named defendants and in holding that the action of the Comptroller in issuing a bank charter was valid and, secondly, whether the court was required to consider contentions that the bank to which the charter was issued, namely Union, was in truth a subsidiary of a bank holding company. The defendants-intervenors in this action filed an application with the Comptroller seeking approval for a proposed national bank in Tulsa, Oklahoma, on April 25, 1972. Following a hearing held on August 16, 1972, and a field investigation, the application was approved by the Regional Comptroller and the National Bank Examiner and, finally, by the Comptroller on December 1, 1972.

█ Soon thereafter (on January 19, 1973), the appellant filed a complaint in the United States District Court for the Northern District of Oklahoma in which it claimed that the Comptroller's approval was unlawful because Union, so it was alleged, was a branch of Utica National Bank of Tulsa. Branch banking is prohibited by Oklahoma law.[1] Because of the prohibition, the Comptroller is not allowed to authorize the creation of a branch bank.[2] American further alleged that Union fell within the definition of a subsidiary as defined in the Bank Holding Company Act, 12 U.S.C. §§ 1841–1849, and that this was a violation of Oklahoma law.[3] American has also alleged that the Comptroller's approval was arbitrary and capricious; that his

1. 6 Okla.Stat.1971 § 501.

2. 12 U.S.C. § 36.

3. 6 Okla.Stat. § 502, subd. C.

failure to issue findings of fact and conclusions rendered his decision unlawful.

As previously noted, the organizers of Union intervened as defendants.[4] The matter came on for hearing on October 12, 1973 on the motions for summary judgment of the Comptroller and the defendants-intervenors. The Town and Country Bank which was in the process of being organized under state law opposed the position of the defendants during the Comptroller's hearing. Subsequently, the Town and Country application was first denied and later granted by the Banking Board of the State of Oklahoma. The Town and Country associates then sought to intervene, but this application was denied. The District Court ruled that the Comptroller's approval was rational, was not arbitrary nor capricious, and further held that Union would not have to be regarded as a branch bank. The court rejected American's contention that it had authority to consider the holding company complaints.

In No. 74–1082, Town and Country has appealed the denial of intervention. American has appealed the granting of summary judgment in No. 74–1083. There has been consolidation of the cases and joint arguments have been made.

The position of American at the trial was that the Comptroller's approval was unlawful because it resulted in the creation of a subsidiary of a bank holding company. There is also the contention that the application should have been stayed pending determination by the Federal Reserve Board. The bank holding company issue was raised by the Town and Country organizers who requested that the Comptroller refer this holding company issue to the Federal Reserve Board and allow his decision to abide the action of the Federal Reserve Board.

■ It would appear that the District Court had jurisdiction to determine whether the Comptroller acted improperly in failing to refer those issues to the Federal Reserve Board pursuant to 28 U.S.C. § 1331. On the other hand, it seems equally clear that the District Court lacked jurisdiction to determine the merits of the alleged violation of the Holding Company Act.

■ Although we do not have jurisdiction to determine the merits of whether Union Bank is a subsidiary of a bank holding company thus requiring Reserve Board approval, we do have the authority to determine whether or not this issue is substantial or frivolous, and whether the Federal Reserve Board *should have an opportunity to consider it.* In our view the question is not a frivolous one because:

The organizers of Union are also closely connected with the Utica National Bank. Victor M. Thompson is president and is a director. Calvert, LaFortune, Saunders, Horkey and Zink are all directors of Utica. Victor B. Thompson is the son of Victor M. Thompson. Mr. Horkey is the only one of the group who *will not* be a director of Union. There would be other directors but we are not acquainted with their identity.

Secondly, Utica is a subsidiary of a registered bank holding company, Helmerich and Payne, Inc. (H & P), which owns or controls over 36% of Utica's stock. Mr. LaFortune (and his family) own 10 to 15%. Calvert and V. M. Thompson each own about 5%. Horkey is executive vice president and a director of H & P.

Thirdly, Union's stock is to be offered on a pro-rata basis to the shareholders of Utica. The organizers alone intend to purchase nearly 19% of the Union shares.

An effort was made by the organizers to avoid the appearance of Union being a subsidiary of a bank holding company. H & P did not exercise any right to purchase Union stock. Mr. Horkey, although an officer of H & P, was not to be a director of Union. Also, his inten-

4. Floyd A. Calvert, William R. Horkey, Joseph A. LaFortune, Dickson M. Saunders, Victor B. Thompson, Victor M. Thompson and John S. Zink.

tion was to purchase only .8% of Union's stock. The Comptroller conditioned his approval on no one individual's owning more than 5% of Union's stock.

Thus, evidence before the Comptroller revealed that H & P exerted a good deal of influence on the board of Utica, which in turn exerted influence on the organizers of Union.

The definition of a bank holding company in the Act, 12 U.S.C. § 1841(a)(1) is a company "which has control over any bank or over any company that is or becomes a bank holding company by virtue of this chapter." The Act goes on to define control:

"Any company has control over a bank or over any company if—

(A) the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company;

(B) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or

(C) the Board determines, after notice and opportunity for hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company." 12 U.S.C. § 1841(a)(2).

[4] There is a presumption under § 1841(a)(3) that a company controlling less than 5% of the stock does not have control in a § 1841(a)(2)(C) case. In a non-§ 1841(a)(2)(C) proceeding there is a conclusive presumption that a company which does not control 5% or more of the stock does not have control. § 1841(a)(4). Under the Federal Reserve

Board regulations there are also similar presumptions of control. 12 C.F.R. § 225.2 (1974). Section 225.2(b)(1) creates a presumption of control if the company that owns or controls more than 5% of the stock also has one or more of its own directors serving a similar function in the subsidiary and no other person owns or controls more than 5% of the stock.

As a result of the care exercised to prevent these sections from operating, there would appear to be at least some possibility that Union is in effect a subsidiary of H & P. There exists also a possibility that Union is a subsidiary, not merely an affiliate, of Utica under 12 C.F.R. § 225.2(b)(3).[5]

As noted above, it is not entirely clear that Union is a subsidiary of either H & P or Utica. At the same time, there exists some degree of likelihood that it will be. That being the case, the issue ought to be determined prior to the issuing of Union's charter so that relationships will not be formed which will have to be disentangled.[6]

■ A definitive decision of the Supreme Court holds that the Comptroller does not have jurisdiction to determine whether or not the Bank Holding Company Act has been violated. This prerogative belongs to the Federal Reserve Board. *See* Whitney National Bank v. Bank of New Orleans and Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

Whitney Bank, which was located in New Orleans, sought to extend its business beyond its home base, notwithstanding that branch banking was prohibited under Louisiana law. Following discussions with the Deputy Comptroller, it decided to establish a holding company and set up two new subsidi-

---

5. This provides:
   A company that enters into any agreement or understanding with a bank or other company (other than an investment advisory agreement), such as a management contract, pursuant to which the company or any of its subsidiaries exercises significant influence with respect to the general

management or overall operations of the bank or other company presumably controls such bank or other company.

6. *See* California v. Federal Power Commission, 369 U.S. 482 at 488, 489, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).

aries, the Bank of New Orleans and a new bank in another area. Preliminary approval of the Comptroller was obtained. An application had been filed with the Federal Reserve Board, and so the Comptroller's action was subject to approval by that body. A hearing was held and the Board approved Whitney's proposal. However, soon thereafter, the respondents in the case filed suit naming the Comptroller as defendant and sought a judgment preventing him from issuing a certificate. Two of the respondents then sought a reconsideration by the Board which was refused, and a review by the Court of Appeals was then sought pursuant to 12 U.S.C. § 1848. The district court in the suit against the Comptroller decided that the Comptroller was prohibited from issuing the certificate. The Court of Appeals upheld the district court and found also that the new bank would be unlawful. However, the Supreme Court reversed, holding that the district court had no jurisdiction to pass on the merits of the holding company's proposal on account of the exclusive jurisdiction of the Board.

The Supreme Court noted that the real issue in the case was not the Comptroller's issuance of authority to do business but, rather, the creation of a new bank by the holding company. If the new bank was found to be either a branch bank or a subsidiary barred by state law, the application could not be approved by the Federal Reserve Board. Hence, both of these issues were subject to determination by the Board.[7]

Obviously, then, the Board's determination could not be attacked by means of an action against the Comptroller since the district court did not have jurisdiction to adjudicate the crucial issue.

The most significant action which the Supreme Court took in the *Whitney* case was to stay its judgment for 60 days so as to allow the parties to move in the Court of Appeals for the Fifth Circuit for a remand of the action to the Board and to allow the Court of Appeals to issue necessary orders to protect its jurisdiction pending final determination of the matter. *See* 379 U.S. at 415, 85 S. Ct. 551, 13 L.Ed.2d 386. The reason for this was the fact that there was a relationship between the case before the Supreme Court and that in the Court of Appeals and a necessity for the Board of Governors to consider the new law in Louisiana.

The Court's explanation for allowing the Court of Appeals to protect its jurisdiction was that the Comptroller was prepared to issue a certificate to do business to the new bank once the injunction was vacated. The Court recognized the authority of the Court of Appeals to prevent the issuance of the certificate pending final disposition of the matter. It was made clear by the Supreme Court that the Comptroller could be precluded from acting until it was determined whether there was a violation of some other law.[8] At the same time, the Supreme Court was clear in stating that the court did not have the authority to determine originally the legality of the issuance of a certificate under the Bank Holding Company Act. The Court also recognized that the issuance of the certificate by the Comptroller would not affect the Board's power to take such action as was indicated.

---

7. In holding that the issue must first be raised before the Board, the Court said:

> We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization. or operation of a new bank by a bank holding company may be tested. Admittedly the acquisition of an existing bank is exclusively within the jurisdiction of the Board. We know of no persuasive reason for finding a different procedure required where it is a new bank that is sought to be organized and operated simply because the Comptroller there performs a function in addition to that of the Board, *i. e.*, the issuance of the certificate to do business.
> . . . . [I]t is the exclusive function of the Board to act in such cases and contests must be pursued before it, not before the Comptroller.

379 U.S. 419–420, 85 S.Ct. 557.

8. *See* 379 U.S. at 426, fn. 7, 85 S.Ct. 551, 13 L.Ed.2d 386.

■ There is no provision in the Act of Congress which requires a Comptroller to give notice to the Board of the issuance of a certificate or to refer a matter to the Board which involves the Board's authority. On the other hand, the Federal Reserve Board must give notice to the Comptroller when it receives an application under the Bank Holding Act. 12 U.S.C. § 1842(b).[9]

If an applicant were required to obtain an approval from each agency there would likely not be this kind of problem. The Comptroller could, of course, condition approval of Union's application on the obtaining of approval from the Board.[10]

We note that *Whitney* suggests at least that where there is a pending application before the Board the Comptroller lacks authority to issue a certificate. The Supreme Court was concerned that a possible violation of federal law had been overlooked because of procedural obstructions. Our concern is the same. In the interest of orderly administration it would seem that the Comptroller should refuse to issue a certificate where a claim is made that the organizer should have sought the Board's approval. Delay of the Comptroller's issuance of a certificate is fully justified by 12 U.S.C. § 27 which allows the Comptroller to issue a certificate only after it appears that the association is lawfully entitled to commence the business of banking.

The Eighth Circuit in Gravois Bank v. Board of Governors of Fed. Res. System, 478 F.2d 546 (8th Cir. 1973) adopted the position that the court had ample authority to retain jurisdiction pending clearance from the Federal Reserve Board. Under the *Whitney* and *Gravois* decisions the courts need not stand idly by where a matter is pending before the Board of Governors. The courts may use their process to stay the Comptroller's hand until the Board has had an opportunity to process the application. Should there be authority where there are objections suggesting a violation of the Federal Reserve Act or regulations? The mere presence of an objection should not give rise to this extraordinary use of court process. However, if the matter appears to be a substantial problem—and this is substantial—it would seem that the spirit of the *Whitney* case requires that there be action. The issue of a possible violation of the Federal Reserve Act is not a frivolous one and, considered in that light, it follows that the Comptroller should have referred the matter to the Federal Reserve Board. In view of the failure to do this, the issuance of the mandate should be stayed for an initial period of 60 days to allow the parties to present this matter to the Federal Reserve Board. The Comptroller's hand is hereby stayed pending the issuance of this court's mandate. Once the Federal Reserve Board has acted, the mandate will issue.

We have concluded that the District Court was correct in its ruling that the Comptroller's fact-finding and determination based on the evidence were not incorrect. Most of the contentions of the appellants are without merit. Thus, formal findings are not necessary. *See* Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The Comptroller conducted a full field investigation and a public hearing. The only issue is that which we have considered at some length, that is, the holding company question.

The issuance of the mandate is stayed until the further order of the court. In the event that any party within 60 days

---

9. *See also* 12 U.S.C. § 1828(c) which requires the responsible agency (the Comptroller, the Board or the FDIC (depending on the circumstances)) to request a report from the Attorney General and the other two agencies before approving a bank merger or consolidation.

It is curious that Congress has not required the Comptroller to notify the Federal Reserve Board even where the Board's authority is obviously in question.

10. In Gravois Bank v. Board of Governors of Fed. Res. System, 478 F.2d 546 (8th Cir. 1973), the court held that where Board approval is required the Comptroller *must* condition the granting of the charter on subsequent Board approval.

makes a pertinent application to the Federal Reserve Board under the Bank Holding Company Act, the mandate shall not issue until the decision of the Board becomes final. If no application is made to the Federal Reserve Board within the 60-day period, the court will consider a motion for the issuance of the mandate. In the circumstances presented we see no need at this time to decide the right of the Town and Country group to intervene. The issues which they present are matters of law and we have considered their arguments. If it later appears necessary to remand the case to the district court for further proceedings, we will consider the Town and Country intervention question. The Comptroller shall not grant a charter to the Union National Bank of Tulsa until the issues discussed herein are resolved and a mandate issues.

It is so ordered.